NATIONAL LABOR RELATIONS BOARD, Petitioner,

and

United Steelworkers of America, AFL-CIO, Intervening Petitioner,

v.

**ROLL AND HOLD WAREHOUSE AND DISTRIBUTION CORPORATION, Respondent.**

No. 98–1448.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 2, 1998.

Decided Dec. 8, 1998.

Leonard R. Kofkin, Steven J. Teplinsky (argued), Michael, Best & Friedrich, Chicago, IL, for Respondent.

Elizabeth Kinney, N.L.R.B., Chicago, Il, John D. Burgoyne, Daniel J. Michalski (argued), N.L.R.B., Appellate Court, Enforcement Litigation, Washington, DC, for Petitioner.

Daniel M. Kovalik (argued), United Steelworkers of America, Asst. Gen. Counsel, Pittsburgh, PA, for Intervening Petitioner.

Before FLAUM, MANION, and ROVNER, Circuit Judges.

FLAUM, Circuit Judge.

We are asked to review and enforce an order of the National Labor Relations Board ("NLRB" or "Board") charging Roll and Hold Warehouse ("Roll") with unfair labor practices involving the unilateral implementation of a new attendance policy without first bargaining with the United Steel Workers of America ("Union"). Because substantial evidence supports the NLRB's decision, we now grant its application for enforcement.

## Background

Since 1987, the Union has represented a unit of approximately 30 employees at Roll's warehouse and distribution facility in Gary, Indiana. Although the Union and Roll had a formal collective bargaining agreement in the late 1980's, the agreement expired in 1991. In the early 1990's Union spokesman William

Trella attempted to renew the agreement with Roll's manager, Glenn Becker, but these negotiations failed to yield a new contract. The Union, however, remained the collective bargaining representative for Roll's employees.[1]

Until early 1995, Roll maintained an informal, unwritten attendance policy at the warehouse which was only sporadically enforced. Responding to employee complaints of inconsistent treatment and favoritism, Becker devised a formal point system attendance plan which he implemented on February 6, 1995. The current dispute centers on the events immediately preceding the adoption of this plan.

Although the parties disagree on the exact dates, the NLRB's Decision and Order ("Order") sets forth the following sequence: In January 1995, Becker began distributing written copies of the new policy to Roll's employees. Over the next few weeks he called small groups into his office to explain and discuss the policy. He also had each employee sign a document stating that he or she had been given a copy of the proposed plan. At some point in January, Warren Fryer and Terry Edwards, who served as the Union's on-site representatives at Roll, attended one of these meetings. Fryer testified that during his meeting he objected to the point system plan and asked whether it had been negotiated with Trella. While it is unclear what Becker said in response, both parties agree that he never gave formal notice of the proposal to the Union before conducting these meetings. However, prior to February 6, the effective date of the policy, Fryer told Trella about it, and no one from the Union ever requested bargaining until after it was implemented.

Later that spring, the Union charged Roll with unfair labor practices in violation of Section 8(a)(1) and (5) of the National Labor Relations Act ("Act"), 29 U.S.C. § 158(a)(1) and (5). Among other things, the Union charged Roll with having unilaterally implemented the new attendance policy without bargaining in good faith. Section 8 makes it an unfair labor practice for an employer to "refuse to bargain collectively" (29 U.S.C. § 158(a)(5)) with respect to "wages, hours and other terms and conditions of employment . . ." 29 U.S.C. § 158(d). The Administrative Law Judge ("ALJ") found in favor of Roll on the Section 8(a)(5) claim, determining that, although Roll never formally submitted the proposal to the Union, because Fryer, Edwards and Trella all knew about the attendance plan prior to implementation, the Union had waived its right to bargain by failing to make a demand.

The NLRB overturned the ALJ's decision concerning the unilateral implementation claim. The Board held that the Union had a right to prior notice of all significant policy changes and that, in this case, notice was not sufficient to give the Union an opportunity to engage in meaningful negotiations with Roll. Additionally, because Roll presented the policy as a fait accompli and the Union reasonably believed that it would be futile to request negotiation, the Union had not waived any rights by failing to make a bargaining demand. NLRB Member Higgins dissented from the Order, stating that the record did not support the finding that the proposed policy was "etched in stone" when the Union received notice. Because negotiation was still possible, he concluded, the Union had waived its bargaining rights.

Roll now appeals the Board's decision,[2] and the NLRB seeks enforcement of its Order.[3]

## Analysis

Roll challenges the NLRB's Order on four grounds: (1) that the policy change was not

---

1. Before the NLRB, Roll argued that the Union had lost the support of its employees. The Board rejected this claim and Roll does not challenge its decision.

2. The Union has intervened in support of the NLRB, and seeks enforcement of its Order.

3. The Union also claimed that Roll violated Section 8(a)(1) of the Act by tearing down Union

notices from employee bulletin boards and by telling employees that bonuses would be reduced to pay OSHA fines. The ALJ found for the Union on these claims and the NLRB affirmed. The Board now seeks enforcement of its Order addressing these unfair labor practices. 29 U.S.C. § 160(e). Because Roll does not challenge the Board's conclusions, the NLRB is entitled to summary enforcement. See *NLRB v. Alwin Mfg. Co.*, 78 F.3d 1159, 1162 (7th Cir.1996).

material and therefore did not trigger Roll's obligation to bargain with the Union; (2) that the Union had waived its right to bargain over policy changes by silently acquiescing to similar changes in the past; (3) that the Union had actual notice of the proposed policy and had defaulted on its right to bargain by failing to make a request, and (4) the Board's decision impermissibly ignored the ALJ's credibility determinations.

### Standard of Review

The NLRB's factual determinations are reviewed for substantial evidence on the record. 29 U.S.C. § 160(e) ("The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive."); *Union–Tribune Pub. Co. v. NLRB*, 1 F.3d 486, 491 (7th Cir.1993). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support the Board's conclusion." *Mary Thompson Hosp. v. NLRB*, 943 F.2d 741, 745 (7th Cir.1991) (quoting *Roadmaster v. NLRB*, 874 F.2d 448, 452 (7th Cir.1989)). While our review is meaningful, it is decidedly deferential: "We will not overturn the Board's findings merely because 'we find [ ] the opposite conclusion more reasonable' or 'question the factual basis.' " *Union–Tribune Pub.*, 1 F.3d at 491 (quoting *NLRB v. Advance Transp. Co.*, 965 F.2d 186, 190 (7th Cir.1992)). In other words, "the Board's reasonable inferences may not be displaced on review even though [we] might justifiably have reached a different conclusion ..." *U.S. Marine Corp. v. NLRB*, 944 F.2d 1305, 1313–14 (7th Cir.1991) (en banc). This standard applies to the Board's application of the facts to the law (*NLRB v. Winnebago Television Corp.*, 75 F.3d 1208, 1212 (7th Cir.1996)), and it remains the same even when "the Board and the ALJ disagree over legal issues or derivative inferences that may be drawn from the evidence." *Molon Motor & Coil Corp. v. NLRB*, 965 F.2d 523, 526 (7th Cir.1992). Finally, we apply a similarly deferential standard in determining whether the Board's legal conclusions have a reasonable basis in law. *Id.*; *see Universal Camera v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

### Was Duty to Negotiate Triggered?

Roll first argues that because the new attendance plan only formalized the prior policy, it did not have an impact on its employees sufficient to trigger Roll's duty to collectively bargain. We disagree with this assertion. While some management decisions may have such slight impact on the 'terms and conditions' of employment that they are not reasonably encompassed by Section 8, Roll's decision to adopt the new attendance policy is not one of them.[4] *See Rust Craft Broadcasting v. National Ass'n of Broadcast Employees*, 225 NLRB 327, 1976 WL 7242 (1976); *St. John's Hospital v. Amalgamated Food Employees Local 590*, 281 NLRB 1163, 1168, 1986 WL 54417 (1986). As both the ALJ and the Board found, the point system plan was not a mere continuation of the prior, informal policy. Employee complaints led to its creation, and Roll clearly intended to depart from the old system in favor of a more objective point scheme to allay their concerns. *See Murphy Diesel Co. v. NLRB*, 454 F.2d 303, 304–07 (7th Cir.1971) (new absentee policy more than clarification of old rules and subject to mandatory bargaining); *Bryan Mem'l Hosp. v. NLRB*, 814 F.2d 1259, 1260–63 (8th Cir.1987) (stricter maternity leave policy subject to mandatory bargaining). The record indicates that at least two employees have been fired for absenteeism because of points accumulated under the new plan. This certainly represents the kind of potential impact on working conditions sufficient to have triggered Roll's duty to collectively bargain with the Union. *Ciba–Geigy Pharmaceuticals v. NLRB*, 722 F.2d 1120, 1126–27 (3rd Cir.1983). Roll is unable to support its contrary assertion with authority. In fact, the only case it cites undermines Roll's position. In *W–I Forest Products Company*, the Board concluded that a plant-wide smoking ban was subject to mandatory bargaining. 304 NLRB No. 83,

---

4. Section 8(d) defines the collective bargaining obligation as the duty of the union and employer "to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment ..." 29 U.S.C. § 158(d).

1991 WL 187491 (1991). The attendance policy at issue here has at least as significant an impact on the conditions of employment as the smoking policy in *W–1 Forest Products* had, and it is easily within the scope of Section 8(a)(5) and (1). *See Electri–Flex Co. v. NLRB*, 570 F.2d 1327, 1335–37 (7th Cir. 1978). We note, as the NLRB did, that this new policy may well benefit employees by eliminating inconsistent treatment and favoritism. However, employee benefit is not the test of whether a policy is subject to mandatory collective bargaining. *Id.* at 1333. So long as the new policy represents a material and significant change in working conditions, the Union has a right to bargain over it on behalf of its members. *Id.*

### Waiver by Past Practice

■ Roll next argues that the Union's past practice regarding policy changes amounts to a permanent waiver of its bargaining rights. The employer cites a list of changes it had unilaterally implemented without the Union ever making a bargaining request.[5] According to Roll, this silent acquiescence to new workplace policies amounts to a permanent waiver of the Union's right to bargain over similar changes. *Chesapeake & Potomac Telephone Co. v. NLRB*, 687 F.2d 633, 636 (2nd Cir.1982) ("Waiver can occur ... by the conduct of the parties (including past practices, bargaining history and action or inaction).").

■ The Board found no merit in this waiver argument and we agree. In general, a union only waives its right to bargain if its intent is "clear and unmistakable." *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 708, 103 S.Ct. 1467, 75 L.Ed.2d 387 (1983); *Central Transport v. NLRB*, 997 F.2d 1180, 1189 (7th Cir.1993). The failure to demand bargaining in the past, without more, does not waive that bargaining right forever. *See Ciba–Geigy Pharmaceuticals*, 722 F.2d at 1127. On the contrary "each time [a] bargaining incident occurs—each time new rules are issued—[t]he [union] has the election of requesting negotiations or not." *NLRB v.*

*Miller Brewing Co.*, 408 F.2d 12, 15 (9th Cir.1969). Here, the Union's past practice does not amount to waiver if it does not unmistakably show that the Union intended to permanently give up its right to bargain in the future. *See Metropolitan Edison Co.*, 460 U.S. at 708 n. 12, 103 S.Ct. 1467; *NLRB v. New York Tel. Co.*, 930 F.2d 1009, 1011 (2nd Cir.1991). No statement by the Union suggests that it meant to forego all bargaining over work conditions for all time. Because Roll has pointed to nothing in the record indicating that the Union meant to waive its bargaining rights in anything but those past changes, the Board's finding is amply supported.

### Waiver by Inaction After Notice

■ Roll's primary argument is that the Board should have upheld the ALJ's decision that actual notice combined with the Union's failure to request bargaining amounts to waiver by the Union of its right to negotiate in this case. Because Fryer and Edwards were informed of the new policy well before implementation, it was their duty to request bargaining. Roll argues that it reasonably assumed, after hearing nothing from the Union regarding the attendance policy, that the Union had no objections. The Union's history of inactivity, Roll reasons, coupled with its failure to request negotiation in this case amounted to waiver. As this court has explained:

> a union, which has notice of a proposed change which affects a mandatory bargaining subject, must make a timely request to bargain. Moreover, formal notice is not necessary as long as the union has actual notice. A union's failure to assert its bargaining rights will result in a waiver of these rights.

*W.W. Grainger v. NLRB*, 860 F.2d 244, 248 (7th Cir.1988) (citations omitted).

■ While the NLRB acknowledges that the failure of a union to request bargaining after proper notice waives its right to bargain, the Board excuses the Union in this

5. Roll claims that the unilaterally implemented policy changes involved smoking, sexual harassment, workers compensation, drug screening, family and medical leave, and medical and dental premiums.

case, concluding that notice was inadequate and that a demand to bargain would have been futile. Notice will not be deemed adequate unless it permits a union to meaningfully negotiate over a new policy, *NLRB v. Emsing's Supermarket*, 872 F.2d 1279, 1286–87 (7th Cir.1989), and the determination of the adequacy of notice is essentially one of fact reviewed for substantial evidence. *Id.* Similarly, a union's demand to negotiate will be considered futile when an employer presents a new policy as a fait accompli, indicating that it is unwilling to deal with the union in good faith. *Ciba–Geigy Pharmaceuticals v. International Chem. Workers' Union*, 264 NLRB 1013, 1982 WL 23768 (1982). The Board concluded that the Union did not need to make a bargaining demand because the attendance plan was presented as a fait accompli and additionally, because the Union's negotiating position had been seriously undermined when Roll dealt directly with its employees, thereby precluding meaningful negotiations.

■ While we are skeptical of the Board's fait accompli finding, we nonetheless defer to its determination that presenting the plan to Roll's employees precluded meaningful negotiation.

■ We first address the Board's conclusion that Roll presented the Union with a fait accompli, rendering any demand to bargain futile. *Central Transport*, 997 F.2d at 1188 (7th Cir.1993). The Board indicated that the new attendance policy amounted to a fait accompli because Roll had no intention of negotiating with the Union. As evidence of this, the Board's Order quotes the testimony of Roll's manager, Glenn Becker:

Q. [T]ell us what your position was regarding whether you had to consult with the union, bargain with them, or give them more notice than you did when the February attendance policy went into effect.

A. I didn't think there was any need to. We never did it before. There were all kinds of policies that were coming out. What was the difference in this policy, heck, I hadn't talked with anybody since October 27th, [1993].

325 NLRB No. 1, at 3, 1997 WL 715829 (1997). The Board concluded that this statement "essentially acknowledged that [Roll] never intended to bargain in good faith over this change" and that it would therefore not "penalize the Union for its failure to make a request for bargaining that [the Union] reasonably believed would be futile." *Id.* Here, however, is where the Union's past failure to object to policy changes becomes particularly relevant. The Union should not have inferred futility from Roll's failure to give notice because the Union had never shown an interest in negotiating these policy changes in the past. The Union claims that it did object to some of the past policy changes by filing grievances with the NLRB. However, there is no evidence that it had ever requested bargaining over any of them. Similarly, while Fryer objected to the new policy when it was explained to him, he never requested that the Union be involved in bargaining over the proposed changes. To us, Becker's testimony indicates that Roll had no reason to think the Union wanted to be involved. Roll's failure to give notice in this case is evidence of the Union's past acceptance of policy changes, not Roll's unwillingness to negotiate in good faith. Additionally, Trella admitted that Roll had always negotiated in good faith in the past concerning the collective bargaining agreement. *See W.W. Grainger v. NLRB*, 860 F.2d at 248. However, despite our belief that this is the better reading of the facts, under the substantial evidence standard of review, we will not displace the inferences chosen by the Board, "though [we] would justifiably have made a different choice had the matter been before [us] de novo." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Emsing's Supermarket*, 872 F.2d at 1287.

We find more convincing the Board's second reason for finding that no opportunity for meaningful negotiation existed here: that by presenting the plan directly to employees before notifying the Union, the Union's negotiating role was significantly undermined. *Detroit Edison Co.*, 310 NLRB 564, 565–66, 1993 WL 62321 (1993). One of the purposes of early notification is to allow a union the opportunity to discuss a new policy with unit

employees so it can determine whether to support, oppose or modify the proposed change. When an employer first presents a policy to its employees without going through the Union, the Union's role as the exclusive bargaining agent of the employees is undermined. *See Inland Tugs v. NLRB,* 918 F.2d 1299, 1311 (7th Cir.1990). Under these circumstances it is more difficult for the Union to present a unified front during negotiations. *See Friederich Truck Service,* 259 NLRB 1294, 1299, 1982 WL 24171 (1982). Also, if the change proves popular among employees, direct dealing may convince them that union representation is unnecessary. *See Detroit Edison Co.,* 310 NLRB at 565–66 (employer's direct dealing over working conditions "convey[ed] to employees the notion that they would benefit more, or receive greater consideration, without union representation").

The ALJ found, and Roll does not dispute, that the Union only learned of the proposed attendance policy change during the process of Becker explaining it to the general workforce. The NLRB has previously held that this does not satisfy the special notice requirement. *Ciba–Geigy Pharmaceuticals,* 264 NLRB at 1017 (union not given proper notice where its representatives "became aware of [the policy] merely because they themselves were employees.") Additionally, Roll admitted that the small group meeting with employees involved "full blown discussions" of the new policy. The Board could reasonably infer from this that Roll was engaged in negotiations directly with employees before the Union learned of the new policy change. The Board concluded that at that point, damage had already been done to the Union's role as the employees' exclusive bargaining representative. In these circumstances, the Board has previously said that failure by the Union to demand bargaining does not waive their right to bargain. *Detroit Edison Co.,* 310 NLRB at 565–66; *see Ciba–Geigy Pharmaceuticals,* 264 NLRB at 1017; *see also Gratiot Community Hosp.,* 312 NLRB 1075, 1993 WL 421718 (1993), *enforced,* 51 F.3d 1255, 1259–60 (6th Cir. 1995); *Intermountain Rural Elec. Ass'n v. NLRB,* 984 F.2d 1562, 1567–68 (10th Cir.

1993); *Southwest Forest Industries v. NLRB,* 841 F.2d 270, 273–74 (9th Cir.1988).

Therefore, while we do not view Roll's new attendance policy as a fait accompli, and we do not believe that the evidence strongly suggests that the employer was unwilling to negotiate in good faith had it been asked, we accept the Board's conclusion that the full blown discussions of the new policy with employees prior to notifying the Union violated Sections 8(a)(5) and (1). *See Detroit Edison,* 310 NLRB at 565–66. Whether the Union was harmed enough to justify its failure to demand bargaining is a question well within the Board's special competence, and there is sufficient evidence on the record to support its conclusion. *See Central Transport, Inc. v. NLRB,* 997 F.2d 1180, 1189 (7th Cir.1993); *NLRB v. P.I.E. Nationwide,* 923 F.2d 506, 513 (7th Cir.1991).

### *Credibility of Witnesses*

■ Roll's final contention is that in order for the Board's decision to be based on substantial evidence, it must have credited the testimony of witnesses the ALJ found unreliable—specifically, that of Trella, Fryer and Edwards. This, Roll argues, is impermissible given the ALJ's unique opportunity to observe and evaluate credibility. *NLRB v. Stor–Rite Metal Products, Inc.,* 856, F.2d 957, 964 (7th Cir.1988).

However, the NLRB specifically noted that it did not disturb the ALJ's credibility determinations: "We have carefully examined the record and find no basis for reversing the [ALJ's] findings." 325 NLRB No.1. The Board's conclusions were based either on the ALJ's factual findings or on evidence undisputed by Roll. Its decision is primarily supported by the undisputed fact that the Union did not receive special notice prior to the plan being presented to the general workforce. The disagreement between the Board and the ALJ was over the application of facts to law, not over the facts themselves. This kind of disagreement does not justify reversing the Board's conclusions. *See U.S. Marine Corp. v. NLRB,* 944 F.2d 1305, 1318–19 n. 16 (7th Cir.1991).

### Conclusion

The issue in this case is whether the NLRB correctly found that Roll failed to bargain in good faith over the new attendance policy. The key question is whether the Union waived its right to insist on bargaining through inaction. The Board's answer requires evidence that notice was given too late for there to have been "meaningful negotiation" had the Union requested it. While we find the evidence of a fait accompli less convincing, because the record supports the Board's conclusion regarding damage to the Union, we will not overturn its decision. For these reasons, the Board's application for enforcement of its order is granted in full.